# Exhibit A

Case 1:23-cv-20114-JAL   Document 1-1   Entered on FLSD Docket 01/11/2023   Page 2 of 59

JUDICIAL CIRCUIT, IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.

ISIDRO SUAREZ, MARIBEL ALMAGUER,
MARTHA MORO, and MARIA L. ALMAGUER,
on behalf of themselves and all others
similarly situated,

      Plaintiff,

-vs-

NATIONSTAR MORTGAGE, LLC,
d/b/a Mr. Cooper

      Defendants.

_____

## CLASS ACTION COMPLAINT

Plaintiffs ISIDRO SUAREZ, MARIBEL ALMAGUER, MARTHA MORO, and MARIA L. ALMAGUER ("Plaintiffs"), on behalf of themselves, and all others similarly situated, files this action against NATIONSTAR MORTGAGE, LLC, d/b/a Mr. Cooper ("NATIONSTAR"), for its violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"), Sections 559.72(9), Florida Statutes ("Florida Consumer Collection Practices Act" or "FCCPA"), and Fl.Stat. 701.04. In support Plaintiffs allege the following:

### INTRODUCTION

1.    Plaintiff and Class Members are Florida homeowners whose homes have been in foreclosure. NATIONSTAR is servicer of Plaintiff's and Class Members' underlying homeowner mortgage loans and enforces, and regularly acts as, a debt collector of Plaintiff's and Class Members' mortgage loans.

2.    In its servicing of mortgage loans, NATIONSTAR has routinely and systematically charged  homeowners, including Plaintiff and Class Members, fees via standardized statements ("Payoff Statements") it has sent them that list the amounts it requires for them to pay off their loans.

3.     In its servicing of mortgage loans, through Payoff Statements NATIONSTAR has also routinely and systematically charged homeowners, including Plaintiff and Class Members, improper and excessive costs not otherwise allowed by the loan documents executed by the homeowners, including such fees as "Winterization" fees for Florida residents, property preservation fees wherein the homeowners remain in the property, third party property preservation fees wherein the homeowners remain in the property, payoff quote fees, documentary stamp taxes wherein no such fees are due and outstanding, and hazard inspection fees wherein the homeowners remain in the property.  These fees were charged to the Plaintiffs and have otherwise been charged to other homeowners in the State of Florida.

4.     These fees and the manner NATIONSTAR discloses them are unlawful.

5.     The mortgage instruments of Plaintiff and Class Members only authorize charges for fees actually incurred for services actually performed or otherwise contemplated by the loan documents.  Fees such as "Winterization" are illusory by nature and for which NATIONSTAR otherwise rendered no services, and the other fees are otherwise not contemplated or sanctioned by the loan documents.  Also, the FDCPA requires debt collections to represent debt information in a non-misleading manner and not to misrepresent  amounts owed.  The subject Payoff Statements violate these proscriptions.

6.     For the foregoing conduct as detailed more fully below, Plaintiff brings two counts:  Count I for NATIONSTAR's violation of the FDCPA; and Count II for NATIONSTAR's violation of the FCCPA.  Defendant violated Plaintiffs' and Class Members' substantive rights under these statutes, causing  Plaintiffs and the putative Class Members cognizable injuries, giving rise to this  action for statutory damages under them.

### JURISDICTION AND VENUE

7.     Jurisdiction and venue for purposes of this action is conferred by Chapter 559, Florida Statutes.

Plaintiffs are Florida residents who maintain their homestead and residence in Miami-Dade County, Florida.

9.      At all times material, Plaintiffs were the owner of real property located at 4470 S.W. 1st Street, Miami, Florida 33134.

10.      At all times material, Defendant is a foreign limited liability corporation which is engaged in substantial and not isolated activity within this state, and is otherwise subject to the jurisdiction of this Court pursuant to Fl.Stat. 48.193.  Also, at all times material to this action, Defendant has maintained voluntary, continuous, and systematic contacts with Florida including local offices and operations in Florida, transacting substantial and regular mortgage servicing, foreclosure, and debt collection business in or affecting Florida, including of Plaintiff's loan in this County and other mortgage loans on residential properties including those of Class Members in this County and in Florida, making it foreseeable NATIONSTAR would be subject to this Court's jurisdiction.

11.      Venue is proper in this County under Chapter 47, Florida Statutes, including but not limited to Fl.Stat. 47.011.

12.      All conditions precedent to the filing of this action, if any, have been performed, have occurred, or have been waived.

## PARTIES

13.      Plaintiffs are consumers who jointly own a home in this County.  Plaintiffs are subject to the mortgage loan on that home memorialized by the standardized Uniform Instrument for a single-family home as the borrower.

14.      Each Class Member has entered this same form instrument or a substantially and materially similar standardized mortgage instrument as Plaintiff, or is otherwise subject to the standardized mortgage instrument for the purposes of being subject to foreclosure.

15.      The fees NATIONSTAR charged Plaintiff relating to the subject mortgage loan and the mortgage loans of Class Members alleged throughout this  complaint are the subject of this suit.

16. Defendant's role of mortgage servicer meant that it was responsible for preparation of items concerning the Note and Mortgage including, but not limited to, preparing and sending monthly statements, accounting for credit and debits on the Note, calculating, collecting, and disbursing escrow amounts, sending notices, overseeing the judicial foreclosure process including providing information for the same, and calculating payoff figures and transmitting payoff figures.

17. NATIONSTAR has regularly acted as a mortgage servicer and collector of mortgage loan debts in Miami-Dade County and the State of Florida and has sent Plaintiff and Class Members Payoff Statements imposing on them improper fees for payoffs of their loans here.

18. Whenever in this complaint reference is made to any act or omission of an entity defendant, such allegations shall be deemed to mean that the directors, officers, agents, employees, distributors, partners, contractors, third-party contractors, agencies or representatives of said entity defendant, did authorize or command such act or omission while actively engaged in the management, operation, control or representation of the affairs of said entity defendant, partnership or entity, and while acting within the course and scope of their agency, distributorship, contract, employment, representation and capacity.

## APPLICABLE LAWS

### FDCPA

19. The purpose of the FDCPA is "to eliminate abusive debt collection practices . . . to promote consistent State action to protect consumers against debt collection abuses…" 15 U.S.C. §1692.

20. The FDCPA generally prohibits debt collectors, including SHELLPOINT, from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt" [§ 1692e], and the use of "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f, including, but not limited to:

a. False representations or misrepresentations of "the character, amount, or legal status of any debt." *Id.* at § 1692e(2)(A);

b. False representations or misrepresentations of any "compensation which may be lawfully received by [the] debt collector for the collection of a debt." 15 U.S.C. § 1692e(2)(B);

c. "The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized  by the agreement creating the debt or permitted by law." *Id.* at § 1692f (1); and,

d. "The use of any false representation or deceptive means to collect or attempt to collect" a debt. *Id.* at § 1692e (10).

**FCCPA**

21.    The purpose of the FCCPA is to "provide the consumer with the most protection possible." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 (11th Cir. 2010) (citing § 559.552, Fla. Stat.).

22.    Like the FDCPA, the FCCPA prohibits persons, including SHELLPOINT, from engaging  in certain abusive practices in the collection of consumer debts. *See generally* § 559.72, Fla. Stat.

23.    Specifically, the FCCPA states that no person, including SHELLPOINT, shall "claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist."  §559.72(9), Fla. Stat.

**FACTUAL ALLEGATIONS RELATING TO PLAINTIFF**

24.    On or about November 14, 2006, Plaintiffs Isidro Suarez, Maribel Almaguer, Martha Moro, and Maria L. Almaguer purchased a home in Florida through a  $432,600.00 loan from Lehman Brothers Bank, FSB, secured by a mortgage on the property.  A copy of the

Borrower's mortgage loan agreement is attached as **Exhibit 'A.'** A copy of the mortgage note is

attached as **Exhibit 'B'.** The mortgage loan agreement is a Fannie Mae/Freddie Mac Uniform

Instrument (Form 3010) for Florida.

25.     <u>Payoff Statement to Plaintiff</u>.  On or about December 7, 2022, NATIONSTAR, by

and through their agent, LOGS Legal Group, LLC, provided a response to Plaintiff's request for a

payoff figure, by mailing Plaintiff a standardized Payoff Statement.   A copy of the Payoff

Statement is attached as **Exhibit 'C'.**

27.     The "Total Payoff" necessary to release the lien was for the total amount of

$694,272.87.  This included a table showing fee details that Plaintiff was required to remit to pay

off the mortgage loan.

28      Among the array of fees required to pay off the loan, in the Payoff Statement

NATIONSTAR imposed the following fees:

| | |
|---|---|
| Winterization (Servicer) | $75.00 |
| Property Preservation | $2,712.50 |
| Third Party Reconveyance Preparation Fee | $20.00 |
| Payoff Quote Fee (Servicer) | $50.00 |
| Documentary Tax Stamps | $48.60 |
| Hazard Inspection (Servicer) | $35.00 |

These fees were illusory in nature or otherwise not contemplated by the plain terms of the loan

documents.  For example, the Winterization is fee is nonsensical given that the subject property is

located in South Florida, with this fee and the other fees bearing no rational relationship to an

actual fee in underlying matter and was a made-up, marked-up additional fee for which

NATIONSTAR rendered or received no services, utilized estimate fees, or otherwise was not

authorized to charge under the loan documents.

## NATIONSTAR'S UNIFORM COURSE OF CONDUCT

29.     Plaintiff's experience is not unique.   NATIONSTAR has regularly serviced and

collected on the home mortgage debts of Class Members defined below, and in its servicing of

their mortgage loans, NATIONSTAR has routinely and systematically charged Class Members,

the same fees via standardized Payoff Statements and mailed them when the underlying loans of Plaintiff's and Class Members' were in default.

30.     Upon information and belief, NATIONSTAR tracks its general business practices as it relates to each member of the Class, including Plaintiff, electronically and maintains electronic records that are searchable regarding the loans and debts it collects and the mortgages it services and the fees it imposes and collects. Upon information and belief, NATIONSTAR tracks via electronic records their written requests for information, communications with them, and Payoff Statements.

31.     As with Plaintiff, at the time NATIONSTAR acquired servicing rights to each Class Member's loan, the loan was in default.     Thereafter, NATIONSTAR routinely communicated in writing with the property owner to collect this debt.

33.     Each Class Member like Plaintiff has executed the standardized Fannie Mae/Freddie Mac Uniform Instrument (Form 3010) for a single-family home, or a substantially and materially similar standardized mortgage instrument, which, as stated above, only authorizes fees that are incurred and disbursed for services actually performed in connection with a default on the loan.  Nevertheless, upon information and belief, NATIONSTAR as a matter of routine and general business practice sent the above-described form Payoff Statement imposing on them improper and unauthorized fees to pay off the mortgages loans.

31.     <u>NATIONSTAR's Knowledge</u>. Moreover, NATIONSTAR has systematically made the demands for the illusory and junk fees, *when it knew* these were not legitimate debts and fees and that it had no lawful right to collect from the borrowers.

33.     NATIONSTAR maintains electronic records of the actual costs and fees associated with each borrower's loan, including the loans of Plaintiff and Class Members.  NATIONSTAR is a sophisticated mortgage loan servicer with compliance officers monitoring changes in the law and knowing the  terms of mortgages it services and the statuses of debts and periodic payments it collects on them.

34.    Well before the Payoff Statements at issue, the Eleventh Circuit held that the collection of "estimated" fees was illegal, because the mortgage instruments only allowed for fees actually incurred by the debt collector or servicer. The Eleventh Circuit reversed the district court's grant of summary judgment on the FDCPA and FCCPA claims, opining, among other things, that the defendants were not permitted to charge "estimated" fees that had not yet incurred in their reinstatement of loan letter. *Prescott v. Seterus, Inc.,* 635 Fed. Appx. 640, 647 (11th Cir. 2015) ("[The defendants] violated the FDCPA and FCCPA by charging [the plaintiffs] estimated attorney's fees that they had not agreed to pay in the security agreement."). The same principle should and must apply to illusory fees, fees that never could be accrued or otherwise paid because of the nature of a payoff.

35.    Similarly, well before the Payoff Statements at issue, at least one Court held that marking up fees beyond expenses incurred for services actually rendered stated a violation of the FDCPA. *See Daniel v. Select Portfolio Servicing, LLC*, 159 F. Supp. 3d 1333, 1336 (S.D. Fla. 2016).

36.    Well before the Payoff Statements at issue, the media and trade publications consistently warned the industry against including estimated fees in reinstatement of loan letters, particularly those in the Eleventh Circuit under *Prescott*. Some of those industry warnings are:

a. *11th Circuit Finds Lender Violated FDCPA And Florida Law, Reverses Ruling*, Lexis Legal News (Dec. 7, 2015) ("The appeals court found that Seterus violated the FDCPA and the FCCPA by charging Prescott estimated attorney fees and refused to affirm the District Court's decision.");

b. *Eleventh Circuit Issues Stern Warning Against Inclusion of Estimated Fees and Costs in Reinstatement Quotes*, USFN (Jan. 4, 2016) ("The Prescott decision should cause any lender, loan servicer, or law firm that provides reinstatement quotes and/or figures to borrowers to examine its practices and procedures in order to determine whether or not information being provided to borrowers in reinstatement situations could potentially constitute a FDCPA violation (or a violation of state consumer protection law, such as the FCCPA). The Eleventh Circuit has sent a clear message to the financial services industry…");

c. *Recent Eleventh Circuit Reversal Sparks Upward Trend in Estimated-Fee FDCPA Litigation*, Lenderlaw Watch (Feb. 9, 2016) ("Concluding that the payoff quote was a demand for payment, [the Eleventh Circuit] held that the inclusion of fees that had not yet been incurred (even if expressly designated as such) was a demand for compensation not permitted by the plaintiff's mortgage agreement. . . . [L]oan servicers should consider the impact of *Prescott* on their

communications with borrowers.");

d. *News Alert: FDCPA Violations for Estimated Fees and Costs in Reinstatement and Payoff Quotes*, Potestivo & Associates (April 15, 2016) ("The recent Appellate Court decision in Prescott, v. Seterus, Inc. . . . has gained nationwide notice. Although the decision is only binding on the Eleventh Circuit, it has opened the door and neatly laid the groundwork for other jurisdictions to give similar rulings in the future. Consequently, it is important for servicers and attorneys to be informed and proactive regarding their decisions when it comes to estimated fees and costs in reinstatement and payoff quotes."); and,

e. *A Violation of the FDCPA – Estimating Attorney's Fees in Reinstatement Figures*, Legal League 100 Quarterly (Q2 2016) ("The federal courts have recently held that lenders may only charge for fees and expenses already incurred.").

37. The Common Injury. The FDCPA and the FCCPA respectively create shared, substantive statutory rights for Plaintiff and Class Members.

38. The FDCPA creates a private right of action under 15 U.S.C. § 1692k. By the FDCPA Congress created shared, substantive statutory rights of Plaintiff and Class Members to be enforced privately, including,

a. The rights to receive accurate information, representations, and disclosures, about debts, including the fees comprising them;

b. The rights to receive information, representations, and disclosures, about debts, including the fees comprising them, that do not falsely or in a misleading manner state, or do not misrepresent, "the character, amount, or legal status of any debt;"

c. The rights to receive information, representations, and disclosures, about debts, including the fees comprising them, that do not falsely or in a misleading manner state, or do not misrepresent, the fee "compensation which may be lawfully received by any debt collector for the collection of a debt;"

d. The rights to be protected from unfair or unconscionable practices in collections of their debts, including, but not limited to, the right to be obligated for and subject to collection of debt amounts and fees *only* when expressly authorized by the agreement creating the debt or permitted by law; and,

c. The rights to protection from deceptive means of collecting debts, including the fees comprising them.

*See* 15 U.S.C. §§ 1692, 1692e, 1692f, 1692k.

38.     The FCCPA also creates a private right of action. *See* § 559.77, Fla. Stat. By enacting the FCCPA the Florida Legislature created shared, substantive statutory rights of Plaintiff and Class Members to be enforced privately, including, but not limited to, the rights to be protected from collection of their debts by (a) persons who know that the debts they are attempting collect from them are not legitimate or (b) persons that assert the existence of some legal right *vis-à-vis* their debts when such person knows that the right does not exist. §§ 559.72, 559.72(9), 559.77, Fla. Stat. 56. By NATIONSTAR's imposition and representations in Payoff Statements of non-existent charges, NATIONSTAR violated the shared substantive rights of Plaintiff Class Members under the FCCPA, because in those statements NATIONSTAR attempted to collect debts when it knew,

a. That it had no legal right to collect them or that the debts were not legitimate under the terms of Plaintiff's and Class Members' mortgage instruments; and,

b. That it had no legal right to collect them or that the debts were not legitimate because they were not permitted by law.

## CLASS ACTION ALLEGATIONS

39.     Plaintiffs asks to be designated as a "Class Representative," and as Class Representative brings this action under Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all other persons similarly situated—the "Classes" or "Class Members" defined as follows:

### FDCPA "Winterization" Fee Class

Within the applicable statutes of limitation, all natural persons, (a) whose residences with addresses in Florida were mortgaged under the standardized Fannie Mae/Freddie Mac Uniform Instrument (Form 3010) or a substantially similar standardized residential mortgage instrument; (b) for whose mortgage loans under those instruments NATIONSTAR acquired servicing rights after the loans were in default; and (c) whom NATIONSTAR mailed a Payoff Statement after acquiring servicing rights, representing a "Winterization" fee among costs when no such cost was never or would be accrued.

"Property Preservation" "Third Party Reconveyance Preparation Fee"
and "Hazard Inspection Fee" Class

Within the applicable statutes of limitation, all natural persons, (a) whose residences with addresses in Florida were mortgaged under the standardized Fannie Mae/Freddie Mac Uniform Instrument (Form 3010) or a substantially similar standardized residential mortgage instrument; (b) whose mortgage payments under those instruments NATIONSTAR collected; and (c) whom NATIONSTAR mailed a Payoff Statement, after acquiring servicing rights, representing a "Property Preservation Fee" or "Third Party Reconveyance Preparation Fee" and "Hazard Inspection" fee among costs when no such cost was never or would be accrued or should have been accrued wherein the homeowners resided and maintained the property.

Fl.Stat. 701.04 Class

Within the applicable statutes of limitation, all natural persons, (a) whose residences with addresses in Florida were mortgaged under the standardized Fannie Mae/Freddie Mac Uniform Instrument (Form 3010) or a substantially similar standardized residential mortgage instrument; (b) whose mortgage payments under those instruments NATIONSTAR collected; and (c) whom NATIONSTAR mailed a Payoff Statement, after acquiring servicing rights, representing a "Payoff Quote Fee" and "Documentary Tax Stamp" fee among costs when no such cost was permissible under the loan documents.

40.     Plaintiff and Class Members reserve the right to amend the Class definitions as discovery proceeds and to conform to the evidence. Excluded from the Classes are persons whose Payoff Statements according to NATIONSTAR's records were returned as undeliverable, persons whose mortgages were for commercial purposes, not for personal, family, or household purposes, and Defendant, and any subsidiary or affiliate of Defendant, and the directors, officers and employees of Defendant or its subsidiaries or affiliates, and members of the federal judiciary.

40.     ***Numerosity (Rule 23(a)(1)).*** Plaintiff alleges on information and belief that the number of Class Members is so numerous that joinder of them is impractical. At this time, Plaintiff does not know the exact number of Class Members, but the members of the Classes will be easily ascertained through Defendant's electronic records, data, and databases.

41.     ***Commonality (Rule 23(a)(2)).*** There are common questions of law and/or fact that predominate over any questions affecting only individual members of the class. These predominant common questions of law and/or fact include the following:

a.      Whether the Fannie Mae/Freddie Mac Uniform Instrument (Form 3010) or a

substantially similar standardized residential mortgage instrument executed by Borrower and Class Members authorizes SHELLPOINT to impose "estimated" fees;

b.      Whether the Fannie Mae/Freddie Mac Uniform Instrument (Form 3010) or a substantially similar standardized residential mortgage instrument executed by Plaintiff and Class Members authorizes NATIONSTAR to impose a "Winterization" fee.

c.      Whether SHELLPOINT's impositions of "Winterization" fees, when no such costs ever accrued, violate the FDCPA;

d.      Whether SHELLPOINT's impositions of "Winterization" fees, when no such costs ever accrued, violate the FCCPA;

e.      Whether Plaintiff and Class Members are entitled to statutory damages under the FDCPA and the amounts thereof; and,

f.      Whether Plaintiff and Class Members are entitled to statutory damages under the FCCPA and the amounts thereof.

g.      Whether Plaintiffs and Class Members are entitled to damages under Fl.Stat. 701.04 and the amounts thereof.

42.     ***Typicality (Rule 23(a)(3))***. The claims of the Class Representative are typical of the claims that would be asserted by other members of the Class in that, in proving her claims under the FDCPA and FCCPA, Plaintiff will simultaneously prove the claims of all Class Members. The rights afforded under the FDCPA and the FCCPA are the same for Plaintiff and Class Members. Plaintiff and each Class Member entered a substantially similar standardized mortgage instrument and was sent the standardized Payoff Statement described above by SHELLPOINT, when it was trying to collect a debt under that mortgage. If this conduct violates the FDCPA and the FCCPA, it does so not only for Plaintiff but for each Class Member. Moreover, any statutory damages awarded under those statutes will be formulaic.

43.     ***Adequacy (Rule 23(a)(4))***. The Class Representative is a legal entity whose mortgaged property is in Florida, and who has no conflicts of interest and will fairly and

adequately protect and represent the interests of each member of the Class. Additionally, the Class Representative is fully cognizant of its responsibility as Class Representative and has retained experienced counsel fully capable of, and intent upon, vigorously pursuing the action. Each class counsel has extensive experience in class and/or FDCPA or FCCPA claims in this District.

44. ***Predominance and Superiority Rule 23 (b)(3)***. The common questions identified above predominate over any questions of law or fact affecting only individual members of the Class. Moreover, class treatment is clearly superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### (Fair Debt Collection Practices Act 15 USC §§ 1692e, 1692f)

45. Plaintiffs adopt and incorporate by reference paragraphs 1 through 44 above.

46. Plaintiffs and each Class Member was a "consumer" as defined by 15 U.S.C. § 1692a(3) when each purchased a home by mortgage in Florida.

47. The mortgage loans of Plaintiff and Class Members are debts under the FDCPA because each is "an[] obligation or alleged obligation of a consumer to pay money arising out of a transaction . . . [that is]…primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).

48. NATIONSTAR is a "debt collector" of those mortgage loans as defined by 15 U.S.C. §1692a(6) because it regularly attempts to collect, and collects, amounts owed or asserted to be owed or due another, including the mortgage debts from Plaintiff and Class Members via Payoff Statements. The Payoff Statement described above indeed uniformly confirmed this by identifying NATIONSTAR as a debt collector. And NATIONSTAR acquired the servicing rights of Plaintiff and each Class Member's mortgage after it was in default.

49. NATIONSTAR engaged in direct "communications" with Plaintiffs and Class Members as defined by 15 U.S.C. § 1692a(2) when it sent them or their representatives Payoff

statements, purportedly demanding money due for reinstatement or payoff of their mortgage loans.

50. The FDCPA creates a private right of action under 15 U.S.C. §1692k.

51. As stated, Congress created shared, substantive statutory rights of Plaintiff and Class Members to be privately enforced and protected under the FDCPA, which NATIONSTAR has violated. *See* 15 U.S.C. §§ 1692, 1692e, 1692f.

52. 15 U.S.C. §1692e states, in relevant part,

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
……
(2) The false representation of—
(A) the character, amount, or legal status of any debt; or
(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
………

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

53. 15 U.S.C. § 1692f states, in relevant part,

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

53. Based on the foregoing allegations, NATIONSTAR used deceptive means of collecting debts—the "Auctioneer Cost"—in violation of 15 U.S.C. § 1692e(10), because it represented them in Payoff Statements in a confusing, inaccurate manner, or in a manner that would likely mislead a consumer.

54. Based on the foregoing allegations, NATIONSTAR violated 15 U.S.C. § 1692e(2)(A) because through its Payoff Statements imposing "Auctioneer Cost" fees, it falsely or in a misleading manner stated, or misrepresented, the amount, character, or status of the

amounts needed to payoff Plaintiffs and Class Members' mortgage debts.

55.     Based on the foregoing allegations, NATIONSTAR violated 15 U.S.C. § 1692e(2)(B) when through its Payoff Statements imposing these fees, it falsely or in a misleading manner stated, or misrepresented, the compensation that it might  lawfully receive from Plaintiffs and Class Members.

56.     Based on the foregoing allegations, NATIONSTAR used unfair means of collecting amounts for "Winterization" fee and incorporating them in violation of 15 U.S.C. § 1692f, because the amounts were not expressly authorized by Plaintiff's and Class Members' mortgage instruments creating their debts as they must be under those instruments, or they were not permitted by law.

57.     These violations of FDCPA caused injury to Plaintiffs and Class Members by violating the foregoing substantive FDCPA rights.

58.     As a result of these violations, Plaintiffs and Class Members are entitled to statutory damages together with reasonable attorney's fees and costs under 15 U.S.C. § 1692(k).

## COUNT II

### (Florida Consumer Collection Practices Act § 559.72(9), Fla. Stat.)

59.     Plaintiff adopts and incorporates by reference paragraphs 1 through 44 above.

60.     Plaintiff and each Class Member was a "debtor" and "consumer" as defined by Section 559.55(8), Florida Statutes, when each purchased a home by mortgage in Florida.  In Section 559.72, Florida Statutes, the FCCPA mandates that "no person" shall  engage in certain practices in collecting consumer debts. NATIONSTAR is a "person" within the meaning  of the FCCPA. *Id.*; *see also* § 1.01(3), Fla. Stat.

61.     The mortgage loans of Plaintiff and Class Members are each a "debt" under the FCCPA because each one is "an[] obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the

subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." § 559.55(6), Fla. Stat.

62.     The FCCPA creates a private right of action. *See* § 559.77, Fla. Stat.

63.     As stated above, the Florida Legislature created shared, substantive statutory rights of Plaintiff and Class Members to be enforced and protected privately under the FCCPA, which NATIONSTAR violated. §§559.72, 559.72(9), 559.77, Fla. Stat.

64.     Under Section 559.72, Florida Statutes,

In collecting consumer debts, no person shall:

……

> (9) Claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate or assert the existence of some other legal right when such person knows that the right does not exist.

65.     Based on the foregoing allegations, NATIONSTAR violated Section 559.72(9), Florida Statutes, by attempting to collect these fees and incorporating them, when, as stated above, it knew that the fees, and as a corollary, the total amounts incorporating them, were not legitimate debts.

66.     Based on the foregoing allegations, NATIONSTAR violated Section 559.72(9), Florida Statutes, by attempting to collect these fees incorporating them, when, as stated above, it knew it had no legal right to collect the fees, and as a corollary, no legal right to collect the total amounts incorporating them.

67.     These violations of FCCPA caused injury to Plaintiff and Class Members by violating the foregoing substantive FCCPA rights.

68.     As a result of these violations, Plaintiff and Class Members are entitled to statutory damages together with reasonable attorney's fees and costs under Section 559.77, Florida Statutes.

## **COUNT III**

### **(701.04, Fla. Stat.)**

Plaintiff adopts and incorporates by reference paragraphs 1 through 44 above.

70.    Fl.Stat. 701.04 states, in pertinent part:

(1)    Within 14 days after receipt of the written request of a mortgagor, a record title owner of the property, a fiduciary or trustee lawfully acting on behalf of a record title owner, or any other person lawfully authorized to act on behalf of a mortgagor or record title owner of the property, the holder of a mortgage shall deliver or cause the servicer of the mortgage to deliver to the person making the request at a place designated in the written request an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage.

(a)    If the mortgagor, or any person lawfully authorized to act on behalf of the mortgagor, makes the request, the estoppel letter must include an itemization of the principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance.

71.    As set forth in 701.04(1)(a), the servicer, acting on behalf of the mortgagor, was only allowed to set forth in the payoff letters "charges [that were] properly due under or secured by the mortgage…."  However, NATIONSTAR elected to make charges that were not properly due under the mortgages, including but not limited to "Payoff Quote Fee" and "Documentary Tax Stamps".

72.    As a direct and proximate result of the imposition of these charges in violation of Fl.Stat. 701.04 and the loan documents, the Plaintiffs and Class Members would be required to pay improper fees to reinstate their loan and otherwise have these amounts in their final judgments.

73.    The Plaintiffs and Class Members will have suffered damages in their inability to pay off their loans without paying improper fees, resulting in either nominal or actual damages.  Plaintiffs seek recovery of same and otherwise seek a declaration that such fees are improper under the mortgage documents and Fl.Stat. 701.04.

## JURY DEMAND AND RESERVATION

Plaintiff respectfully requests a trial by jury on all issues so triable.

## RELIEF REQUESTED

WHEREFORE Plaintiff, on behalf of herself and the Class, respectfully requests this Court to award against NATIONSTAR in favor of Plaintiff and the Class all of the following: a. Certifying either Count I or Count II or Count III or all counts for class treatment under  Federal Rules of Civil Procedure 23(a) and (b)(3), appointing Plaintiff as Class  Representative, and

appointing Plaintiff's attorneys as counsel for the Class;

A.    A judgment for statutory damages under the FDCPA or the FCCPA or Fl.Stat. 701.04;

B.    A judgment for costs and reasonable attorney's fees under the FDCPA or the FCCPA or Fl.Stat. 701.04; and,

C.    Any other relief for Plaintiff and the Class the Court deems just and proper.

Respectfully Submitted,

BRUCE BOTSFORD, P.A.
2524 Flamingo Lane
Ft. Lauderdale, Florida 33312
Telephone: (954) 663-7002
E-Mail: service@botsfordlegal.com
        botslaw@gmail.com


By: _Bruce Botsford_
BRUCE BOTSFORD
Florida Bar No. 31127

# EXHIBIT 'A'

Return To:   **AURORA LOAN SERVICES, LLC**
**601 5th Ave, PO Box 4000**
**Scottsbluff, NE 69363**

CFN 2006R1271413
OR Bk 25140 Pgs 0121 - 144; (24pgs)
RECORDED 11/30/2006 10:58:57
MTG DOC TAX 1,514.10
INTANG TAX 865.20
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

This document was prepared by:

**JAIME NILAN**
**AURORA LOAN SERVICES**
**400 PROFESSIONAL DRIVE, SUITE 100**
**GAITHERSBURG, MD 20879**

——————————————————[Space Above This Line For Recording Data] ———————————————

# MORTGAGE

MIN   100025440003482855

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

**(A) "Security Instrument"** means this document, which is dated   **November 14, 2006**
together with all Riders to this document.
**(B) "Borrower"** is

**ISIDRO SUAREZ** and Maribel Almaguer, his wife

**MARTHA MORO** a single woman

**MARIA ALMAGUER** a single woman

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under
this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address
and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is   **LEHMAN BROTHERS BANK, FSB, A FEDERAL SAVINGS BANK**

**FLORIDA** -Single Family- **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**          Form 3010 1/01

(VMP) **-6A(FL)** (0005)
Page 1 of 16                          Initials: MM  I.H. S MAG

VMP MORTGAGE FORMS - (800)521-7291      MLA

100025440003482855
0039365283

Lender is a **LEHMAN BROTHERS BANK, FSB , A FEDERAL SAVINGS BANK**
organized and existing under the laws of **UNITED STATES**
Lender's address is

    **400 PROFESSIONAL DRIVE, SUITE 500 , GAITHERSBURG, MD 20879**

**(E) "Note"** means the promissory note signed by Borrower and dated **November 14, 2006**
The Note states that Borrower owes Lender
  **FOUR HUNDRED THIRTY TWO THOUSAND SIX HUNDRED & 00/100**
                       Dollars
(U.S. $   **432,600.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   **December 1, 2036**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |
| | | **PREPAY/** |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the
Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the   **County**   [Type of Recording Jurisdiction] of   **Dade**   [Name of Recording Jurisdiction]:

```
All that tract or parcel of land as shown on Schedule "A" attached
hereto which is incorporated herein and made a part hereof.
```

Parcel ID Number:
**4470 SW 1ST STREET**
**MIAMI**
("Property Address"):

which currently has the address of

[Street]

[City] , Florida   **33134**   [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

VMP®-6A(FL) (0005)   Page 3 of 16   Initials: _____   Form 3010  1/01

100025440003482855
0039365283

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in

100025440003482855
0039365283

full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

100025440003482855
0039365283

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard

100025440003482855
0039365283

or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise

100025440003482855
0039365283

agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of

100025440003482855
0039365283

disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

-6A(FL) (0005)                    Page 9 of 10                  Initials: _____                    **Form 3010   1/01**

100025440003482855
0039365283

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

Initials: _N.A._

_I H S_

_N A C_

_M C A_

Form 3010   1/01

100025440003482855
0039365283

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument

100025440003482855
0039365283

shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument,

100025440003482855
0039365283

and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental

100025440003482855
0039365283

Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

100025440003482855
0039365283

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_Carlos Mendoza_
Carla S. Mendoza

_____ (Seal)
**ISIDRO SUAREZ**                    -Borrower

_Michelie Dios_
Michelle Dios

_____ (Address)

_____ (Seal)
                                     -Borrower

_____ (Address)

_____ (Seal)
**MARTHA MORO**                      -Borrower

_____ (Seal)
                                     -Borrower

_____ (Address)

_____ (Address)

_____ (Seal)
**MARIA ALMAGUER**                   -Borrower

_____ (Seal)
                                     -Borrower

_____ (Address)

_____ (Address)

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

_____ (Address)

_____ (Address)

VMP-6A(FL) (0005)                    Page 15 of 16                    Form 3010  1/01

100025440003482855
0039365283

**STATE OF FLORIDA,**                                          Miami-Dade **County ss:**
The foregoing instrument was acknowledged before me this  14 day of November 20 by

ISIDRO Suorez MARTA HORO, MARIA Almaquer
and MARIBEL Almaquer

who is personally known to me or who has produced  ___D.L.___  as identification.

_____
Notary Public

CARLA S. MENDOZA
MY COMMISSION # CD 173745
EXPIRES: April 22, 2007
Bonded Thru Notary Public Underwriters

Exhibit "A"

Lot 8, Block 2, of AMENDED PLAT OF FLAGLER GROVE HEIGHTS, according to the plat thereof, as Recorded in Plat Book 13, at Page 58, of the Public Records of Miami-Dade County, Florida.

100025440003482855
0039365283

# ADJUSTABLE RATE RIDER

**(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this **14th** day of **November, 2006** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to

**LEHMAN BROTHERS BANK, FSB**

("Lender") of the same date and covering the property described in the Security Instrument and located at:

**4470 SW 1ST STREET, MIAMI, FLORIDA 33134**

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of **6.625** %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of **December , 2011** , and on that day every **6th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in <u>The Wall Street Journal</u> . The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND 25 HUNDREDTHS** percentage points ( **2.250** %) to the Current Index. The Note Holder will then round the result of

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN <u>THE WALL STREET JOURNAL</u> ) - Single Family - **Fannie Mae Uniform Instrument**

ⓥ-838R (0402)   **Form 3138 1/01**
Page 1 of 3       Initials: _MM_
VMP Mortgage Solutions, Inc.
(800)521-7291

100025440003482855
0039365283

this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 12.625 % or less than 2.250 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than
TWO                                                        percentage points
( 2.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 12.625 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

100025440003482855
0039365283

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
ISIDRO SUAREZ                -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
MARTHA MORO                -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
MARIA ALMAGUER            -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                                  -Borrower                                    -Borrower

## INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE RIDER

LOAN NUMBER: ▆▆▆▆▆▆

PROPERTY ADDRESS: 4470 SW 1ST STREET
MIAMI, FLORIDA 33134

**THIS ADDENDUM** is made this 14th day of November , 2006      and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as this Addendum executed by the undersigned and payable to

LEHMAN BROTHERS BANK, FSB, 400 PROFESSIONAL DRIVE, SUITE 500, GAITHERSBURG, MD 20879

(the Lender).

**THIS ADDENDUM** supersedes Section 4(C) of the Rider.  None of the other provisions of the Note are changed by this Addendum.

### 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
####     (C)   Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding 2.25                     percentage point(s) ( 2.25 %) to the Current Index for such Change Date.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest.  This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period.  If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance.  At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note.  The result of this calculation will be the new amount of my monthly payment.  After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

Dated:_____11/14/06_____                    _____

                                                 ISIDRO SUAREZ

                                                 _____

                                                 _____

                                                 MARTHA MORO

                                                 _____

100025440003482855
0039365283

## ADDENDUM TO ADJUSTABLE RATE RIDER

This addendum is made **November 14 , 2006** and is incorporated into and deemed to amend and supplement the Adjustable Rate Rider of the same date.

The property covered by this addendum is described in the Security Instrument and located at:
**4470 SW 1ST STREET , MIAMI , FLORIDA 33134**

## AMENDED PROVISIONS

In addition to the provisions and agreements made in the Security Instrument, I/we further covenant and agree as follows:

## ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **12.625** % or less than **2.250** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage point(s) ( **2.000** %) from the rate of interest I have been paying for the preceding six (6) months. My interest rate will never be greater than **12.625** %. My interest rate will never be less than **2.250** %.

## TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

In Witness Thereof, Trustor has executed this addendum.

_____
Witness

_____
Date        11/14/06

_____
Date                                    ISIDRO SUAREZ

_____
Date

_____
Date                                    MARTHA MORO

_____
Date

DIS0221
1202 LIBOR Addendum to Rider                                            1/01

## PREPAYMENT RIDER

### *6 Months of Interest on Amount Prepaid*

This Prepayment Rider is made this 14th day of **November**      , 2006     and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to   **LEHMAN BROTHERS BANK, FSB** (the "Lender") of the same date and covering the property described in the Security Instrument and located at     **4470 SW 1ST STREET MIAMI, FLORIDA 33134**

(the "Property").

**Additional Covenants.**  Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower has the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment."  A "Full Prepayment" is the Prepayment of the entire unpaid Principal due under the Note.  A payment of only part of the unpaid Principal is known as a "Partial Prepayment."

**If, within the** 3 **-year period beginning with the date Borrower executes the Note (the "Penalty Period"), Borrower makes a Full Prepayment or Partial Prepayment in any twelve (12)-month period that exceeds 20% of the original Principal loan amount, Borrower will pay a Prepayment penalty as consideration for the Note Holder's acceptance of such Prepayment.  The Prepayment penalty will be equal to the amount of interest that would accrue during a six (6)-month period on the entire amount prepaid, calculated at the rate of interest in effect under the terms of the Note at the time the Prepayment exceeds 20% of the original Principal loan amount.  If the prepaid amount exceeds 20% of the original Principal loan amount in any twelve (12)-month period, the Prepayment Penalty will be enforced on 100% of the amount prepaid.  No Prepayment penalty will be assessed for any Prepayment made after the Penalty Period.  These provisions will be enforced unless otherwise prohibited by applicable state law or regulation.**

Notwithstanding the foregoing, in the event of a Full Prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first     0   year(s) of the term of the Note, no Prepayment penalty will be assessed.  In that event, Borrower agrees to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

**0039365283**                                                    **100025440003482855**

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____ (Seal)
Borrower
ISIDRO SUAREZ

_____ (Seal)
Borrower
MARTHA MORO

_____ (Seal)
Borrower
MARIA ALMAGUER

_____ (Seal)
Borrower  Maribel Almaguer

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

0039365283                                     100025440003482855

630R – Prepayment Rider
6 Months Interest Amount Prepaid (Full or Partial)
A630R2                              Page 2 of 2                              2/06

# EXHIBIT 'B'

100025440003482855
0039365283

# ADJUSTABLE RATE NOTE

**(LIBOR Six-Month Index (As Published In** *The Wall Street Journal***) - Rate Caps)**

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

**November 14, 2006**          **MIAMI** ,          **FLORIDA**
[Date]                              [City]                     [State]

**4470 SW 1ST STREET, MIAMI, FLORIDA 33134**
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $        **432,600.00**        (this amount is called "Principal"), plus interest, to the order of Lender. Lender is
**LEHMAN BROTHERS BANK, FSB, A FEDERAL SAVINGS BANK**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        **6.625**        %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on   **January 1 , 2007**   .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   **December 1, 2036**   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   **LEHMAN BROTHERS BANK, FSB**
**400 PROFESSIONAL DRIVE, SUITE 500, GAITHERSBURG, MD 20879**
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $        **2,769.99**        . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

---

MULTISTATE ADJUSTABLE  RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED  IN *THE WALL STREET  JOURNAL* ) - Single  Family - **Fannie  Mae** UNIFORM INSTRUMENT
Amended for Florida

-838N(FL) (0005)          Form 3520 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 4          Initials:



100025406003482855
0039365283

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of **December, 2011**                  , and on that day every **6th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding

**TWO AND 25 HUNDREDTHS**                     percentage points (                **2.250**        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than          **12.625**         % or less than        **2.250**        %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than   **TWO**                    percentage point(s) (              **2.000**        %) from the rate of interest I have been paying for the preceding          **6**          months. My interest rate will never be greater than        **12.625**        %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY    SEE ATTACHED ADDENDUM

~~I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.~~

~~I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.~~

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.



Page 2 of 4

VMP®-838N(FL)  (0005)

Initials: 

0039365283<br>0039365283

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.00** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Form 3520 1/01<br>Initials:

100025496003462855
0039365283

**Transfer of the Property or a Beneficial Interest in Borrower**. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
ISIDRO SUAREZ                   -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
MARTHA MORO                     -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
MARIA ALMAGUER                  -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                          -Borrower

Pay To The Order Of
Lehman Brothers Holding Inc
Without Recourse
Lehman Brothers Bank, FSB

By: _____
E. Todd Whittemore
Vice President

**Pay to the Order of**

*[Sign Original Only]*

**Without Recourse**
Aurora Loan Services LLC By Nationstar
Mortgage LLC Its Attorney-In-Fact

By: _____
Assistant Secretary
Rory Jaramillo

ALLONGE TO NOTE

NOTE DATE:              **NOVEMBER 14, 2006**

NAME:                   **ISIDRO SUAREZ**
                        **MARTHA MORO**
                        **MARIA ALMAGUER**

LOAN AMOUNT:            $432,600.00

PROPERTY ADDRESS:       **4470 SW 1ST STREET**
                        **MIAMI, FLORIDA 33134**

ORIGINAL LENDER:        **LEHMAN BROTHERS BANK, FSB, A FEDERAL SAVINGS BANK**

PAY TO THE ORDER OF:    **AURORA LOAN SERVICES LLC**

WITHOUT RECOURSE:

LEHMAN BROTHERS HOLDINGS INC.

BY: Scott E. Brosdick

TITLE: Vice President

0039365283

## INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE PROMISSORY NOTE

LOAN NUMBER: **0039365283**

PROPERTY ADDRESS:

**4470 SW 1ST STREET, MIAMI, FLORIDA 33134**

**THIS ADDENDUM** is made this **14th** day of **November**                    , **2006** , and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to **LEHMAN BROTHERS BANK, FSB** (the Lender).

**THIS ADDENDUM** supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note. None of the other provisions of the Note are changed by this Addendum.

### 3.    PAYMENTS

#### (A)    Time and Place of Payments

I will pay interest by making payments every month for the first **120** payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every month thereafter for the next **240** payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

I will make my monthly payments on the first day of each month beginning on **January 1 , 2007** . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on **December 1, 2036** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my payments at **400 PROFESSIONAL DRIVE, SUITE 500, GAITHERSBURG, MD 20879** , or at a different place if required by the Note Holder.

#### (B)    Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **2,388.31** . This payment amount is based on the original principal balance of the Note. This payment amount may change.

Form 603E
DIS1194

page 1 of 2

12/10/03

0039365283

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (C)    Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding    **TWO AND 25 HUNDREDTHS**                percentage point(s) (   **2.250**   %) to the Current Index for such Change Date.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest.  This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period.  If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance.  At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note.  The result of this calculation will be the new amount of my monthly payment.  After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

## 7.    BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)    Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    **15**    calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be   **5.00**    % of my overdue payment of interest during the Interest-Only Period,   **5.00**    % of my overdue payment of principal and interest thereafter.  I will pay this late charge promptly but only once on each late payment.

Dated:  **November 14, 2006**

_____
Borrower   **ISIDRO SUAREZ**


_____
Borrower

0029365283

# PREPAYMENT NOTE ADDENDUM
*6 Months of Interest on Amount Prepaid*

This Prepayment Note Addendum is made this 14th day of November, 2006 and is incorporated into and shall be deemed to amend and supplement the Note of the same date (the "Note") made by the undersigned (the "Borrower") to evidence indebtedness to

LEHMAN BROTHERS BANK, FSB                                    (the "Lender"), which debt is secured by a Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date and covering the property described in the Security Instrument and located at

4470 SW 1ST STREET                                          (the "Property").
MIAMI, FLORIDA 33134

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender covenant and agree that the provisions of the section of the Note entitled "BORROWER'S RIGHT TO PREPAY" are amended to read as follows:

Subject to the Prepayment penalty provided below, I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." A "Full Prepayment" is the Prepayment of the entire unpaid Principal due under the Note. A payment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

**If, within the 3 -year period beginning with the date I execute the Note (the "Penalty Period"), I make a Full Prepayment or Partial Prepayment in any twelve (12)-month period that exceeds 20% of the original Principal loan amount, I will pay a Prepayment penalty as consideration for the Note Holder's acceptance of such Prepayment. The Prepayment penalty will be equal to the amount of interest that would accrue during a six (6)-month period on the entire amount prepaid, calculated at the rate of interest in effect under the terms of the Note at the time the Prepayment exceeds 20% of the original Principal loan amount. If the prepaid amount exceeds 20% of the original Principal loan amount in any twelve (12)-month period, the Prepayment Penalty will be enforced on 100% of the amount prepaid. No Prepayment penalty will be assessed for any Prepayment made after the Penalty Period. These provisions will be enforced unless otherwise prohibited by applicable state law or regulation.**

Notwithstanding the foregoing, in the event of a Full Prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first 0 year(s) of the term of the Note, no Prepayment penalty will be assessed. In that event, I agree to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

The Note Holder will apply all Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a Partial Prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

0039165283

If my Note is an Adjustable Rate Note, Partial Prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the Partial Prepayment. However, any reduction due to my Partial Prepayment may be offset by an interest rate increase.

The Note Holder's failure to collect a Prepayment penalty at the time a Prepayment is received shall not be deemed a waiver of such penalty. Any Prepayment penalty not collected at the time the Prepayment is received shall be payable on demand.

All other provisions of the Note are unchanged and remain in full force and effect.

## NOTICE TO BORROWER

**Do not sign this Addendum before you read it. This Addendum provides for the payment of a Prepayment penalty if you wish to repay the loan prior to the date provided for repayment in the Note.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED:

_____(Seal)
Borrower
ISIDRO SUAREZ

_____(Seal)
Borrower

_____(Seal)
Borrower
MARTHA MORO

_____(Seal)
Borrower

_____(Seal)
Borrower
MARIA ALMAGUER

_____(Seal)
Borrower

_____(Seal)
Borrower

_____(Seal)
Borrower

# EXHIBIT 'C'



**LOGS Legal Group LLP**

Attorneys at Law

2424 North Federal Highway, Suite 360
Boca Raton, Florida 33431
Tel: (561) 998-6700 • Fax: (561) 998-6707

**Partners**
Gerald M. Shapiro (licensed in FL, IL)
David S. Kreisman (licensed in IL)

**Regional Partner**
Ronald M. Gaché (licensed in FL)

Special Instructions

The below instructions pertain to the "Payoff" quote (provided for settlement purposes only) that is following this announcement.

**Please note**:  A final judgment of mortgage foreclosure has already been entered in this case. Please be advised that remitting funds as instructed in the following letter will settle this action by our office attempting to vacate the judgment, discharge the lis pendens, and, thereafter, dismiss the action.  No payment by you is in satisfaction of the foreclosure judgment.  Instead, the following payoff amount represents the total amount necessary to settle this action.  It is the responsibility of the recipient of this quote and payer of the funds to ascertain the date and time the clerk's foreclosure sale is scheduled to take place, to assure that the correct amount is received in this office prior to the time of that foreclosure sale, and to insure that our office has sufficient time to obtain an order from the court canceling the foreclosure sale.  Our office makes no representation regarding our ability to cancel the pending foreclosure sale.



## LOGS Legal Group LLP
### Attorneys at Law

2424 North Federal Highway, Suite 360
Boca Raton, Florida 33431
Tel: (561) 998-6700 • Fax: (561) 998-6707

**Partners**
Gerald M. Shapiro (licensed in FL, IL)
David S. Kreisman (licensed in IL)

**Regional Partner**
Ronald M. Gaché (licensed in FL)

December 7, 2022

**This is NOT a demand for payment.  This letter is provided for informational purposes only at your request.**

**RE:    PAYOFF** *(provided for settlement purposes only)*
Isidro Suarez
Servicer: Nationstar Mortgage LLC
Property Address:  4470 Southwest 1st Street, Miami, FL 33134
CXE Loan No.:  0599913746
LLG Number.:  17-308662

Dear Mortgagor:

The undersigned firm represents the Plaintiff, U.S. Bank National Association, as Trustee, successor in interest to Wilmington Trust Company, as Trustee, successor in interest to Bank of America National Association, as Trustee, successor by merger to LaSalle Bank National Association, as Trustee for LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-3, in the above referenced legal action.  Recently, you asked our firm for information concerning a settlement of the claims made against you in this lawsuit.  As you know, a final judgment of mortgage foreclosure has already been entered in this case.  Please be advised that remitting funds as instructed in this letter will settle this action by our office attempting to vacate the judgment, discharge the lis pendens and thereafter, dismiss the action.  No payment by you is in satisfaction of the foreclosure judgment.  Instead, the below amount represents the total amount necessary to settle this action as of December 9, 2022:

| | |
|---|---|
| UNPAID PRINCIPAL BALANCE | $529,917.22 |
| Interest Due Date: February 1, 2017 | |
| INTEREST THROUGH 12/09/22 | $113,649.90 |
| PROPERTY INSPECTIONS | $540.00 |
| APPRAISAL FEE | $90.00 |
| NSF CHARGES | $25.00 |
| PROPERTY PRESERVATION | $2,712.50 |
| Escrow Advance(s) | $35,772.05 |
| County Recording Fee | $10.00 |
| Third Party Reconveyance Preparation Fee | $20.00 |
| Payoff Quote Fee (Servicer) | $50.00 |
| Filing Fee/Complaint & Summons | $1,991.00 |
| Filing Fee/LIs Pendens | $9.00 |
| Service Costs | $1,102.60 |
| Publication - Notice of Action | $245.00 |
| Title Search | $60.00 |

www.LOGS.com

Practicing in Indiana as Law Office of Gerald M. Shapiro, LLP

| | |
|---|---|
| Sale Publication | $735.00 |
| Clerk Cost - Sales Fees | $285.00 |
| Clerk Cost - Motion to Reset Sale | $110.00 |
| Documentary Tax Stamps | $48.60 |
| Attorney Fee thru Sale | $4,350.00 |
| Attorney Fee - Additional work due to Hurricane Impacted Properties | $200.00 |
| Attorney Fee - Defendants Motion for Extension of Time | $250.00 |
| Attorney Fee - Court Appearance – Defendants Motion for Extension of Time | $250.00 |
| Attorney Fee - Notice of Cancellation – Plaintiffs Motion to Reset Sale | $150.00 |
| Attorney Fee - Plaintiffs Motion to Withdraw Motion to Reset Sale | $150.00 |
| Attorney Fee - Court Appearance - Motion to Reset Sale | $250.00 |
| Attorney Fee - Prepare Motion to Cancel/Reset Sale | $250.00 |
| Attorney Fee - Plaintiffs Motion to Ratify Sale/Issue COT | $325.00 |
| Attorney Fee - Court Appearance - Plaintiffs Motion to Issue COT | $325.00 |
| Hazard Inspection (Servicer) | $35.00 |
| Winterization (Servicer) | $75.00 |
| Title Search (Servicer) | $290.00 |

**TOTAL AMOUNT DUE**                                $694,272.87

Interest continues to accrue at $88.92 per day after 12/09/22.

Should you wish to simply satisfy the foreclosure judgment, please contact the Clerk of the Court.

Please be advised that we are continuing toward foreclosure sale until such time as the total due above is received in our office at the address specified in this letter.  Funds received after the designated date and time of the clerk's foreclosure sale will not be accepted.  It is the responsibility of the recipient of this quote and payer of the funds to ascertain the date and time the clerk's foreclosure sale is scheduled to take place, and assure that the correct amount is received in this office prior to that time and with sufficient time for our office to obtain an order from the court canceling the foreclosure sale.  Our office makes no representation regarding our ability to obtain such an order prior to the scheduled sale.

**Please be advised that the amount you owe may change daily because of interest continuing to accrue on the principal balance of your mortgage loan and the imposition of other charges authorized by your loan documents. As a result, the amount to pay off your mortgage loan can increase after the date of this letter. Therefore, if you remit funds after the date of this letter, you must contact our office at (813) 880-8888 24 hours before sending any funds to verify that you are sending the correct amount. Failure to do so may result in our rejection of the pay off funds.**

**Funds must be in the form of a WIRE TRANSFER OR CASHIER'S CHECK.  If you need wiring instructions, please contact us at (813) 880-8888. In the event you pay by Cashier's Check, that check should be made payable to Nationstar Mortgage LLC  You must send your CASHIER'S CHECKS to the following address:**

**LOGS Legal Group LLP**
**2424 North Federal Highway**
**Suite 360**
**Boca Raton, FL 33431**

After we receive and verify the funds, and the funds are received by our client and applied accordingly, we will seek to obtain a cancellation of the pending foreclosure sale (if one has been set) and obtain an order that vacates the final judgment (if one has been entered), returns the loan documents to your lender, dismisses the foreclosure lawsuit and lis pendens and directs the clerk to record that order.

**FOR ANY QUESTIONS OR FURTHER INFORMATION, PLEASE CALL OUR OFFICE AT (813) 880-8888.**

Sincerely,

Danielle L. Ryer
Legal Assistant
Payoff/Reinstatement Dept.

Pursuant to the Fair Debt Collection Practices Act, you are advised that this office may be deemed a debt collector and any information obtained may be used for that purpose.